IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EMC CORPORATION AND EMC ISRAEL     )
DEVELOPMENT CENTER, LTD.,     )
    )
          Plaintiffs,     )
    )
         v.     )   C.A. No. 12-956 (GMS)
    )
ZERTO, INC.,     )
    )   REDACTED - PUBLIC VERSION
          Defendant.     )

**EMC'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR A PERMANENT INJUNCTION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

OF COUNSEL:

Michael N. Rader
Allen S. Rugg
Richard F. Giunta
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA  02210-2206
(617) 646-8000

*Attorneys for Plaintiffs*

Paul T. Dacier
Krishnendu Gupta
William R. Clark
EMC CORPORATION
176 South Street
Hopkinton, MA  01748

Originally Filed:  June 19, 2015
Redacted Version Filed:  June 24, 2015

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................1

II. NATURE AND STAGE OF THE PROCEEDINGS ...........................................2

III. SUMMARY OF THE ARGUMENT ..................................................................2

IV. STATEMENT OF FACTS ...................................................................................3

    A. Ziv Kedem and Oded Kedem Left EMC to Found Zerto, a Company that Directly Competes with EMC ...................................................................3

    B. EMC and Zerto Compete Directly in the Market for Replicating and Recovering Virtual Machines...................................................................5

        1. EMC Offers Products that Replicate and Recover Virtual Machines .....................5

        2. Zerto's ZVR Replicates and Recovers Virtual Machines. .......................................6

        3. EMC and Zerto Are Direct Competitors................................................................7

        4. Zerto Markets ZVR as an Alternative to EMC's RecoverPoint............................10

    C. EMC Is Losing Customers to Zerto and ███████████████████████████ .......................................................................11

        1. Lost Customers ......................................................................................................11

        2. ███████████ ...................................................................................................12

    D. The Patented Features Drive Consumer Demand for ZVR .........................................13

        1. Zerto's Customers Demand that ZVR Have the Ability to Create VSS Checkpoints, and Zerto Markets this Feature Heavily...........................................14

        2. The Ability to Mirror Data Between Storage Systems Using an IP-Network Is Essential to ZVR's Commercial Desirability ....................................................15

    E. The Nature of the Virtual Machine Replication Software Market Makes the Scope of EMC's Harm Difficult to Quantify.................................................................16

V. ARGUMENT ......................................................................................................17

    A. Zerto's Infringement Causes EMC Irreparable Harm .................................................17

       1.   EMC Has Lost and Continues to Lose Market Share to Its Direct Competitor Zerto ...............................................................................18

       2.   EMC Is Losing Future Downstream Sales............................................20

       3.   █████████████████████ ...............................21

       4.   Zerto's Infringement Diminishes EMC's Reputation as an Innovator ..................22

       5.   A Causal Nexus Exists Between Zerto's Infringement and EMC's Irreparable Harm......................................................................................23

       6.   Zerto's Ability to Pay Any Monetary Judgment is Unclear...................26

    B.   The Remedies at Law Are Inadequate to Compensate EMC......................................27

       1.   Money Damages Are Insufficient.......................................................27

       2.   EMC's Past Licensing Practices Confirm that Money Damages Cannot Adequately Compensate EMC ...........................................................28

    C.   The Balance of Hardships Favors an Injunction .......................................................31

    D.   EMC's Proposed Injunction Will Not Adversely Affect the Public Interest...............33

VI.  CONCLUSION ........................................................................................................34

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott Labs v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008) .......................................................................33

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) .......................................................................29

*Apple Inc. v. Samsung Elecs. Co.*,
    735 F.3d 1352 (Fed. Cir. 2013) .............................................................23, 24, 26

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    678 F.3d 1314 (Fed. Cir 2012) .....................................................................21, 28

*B. Braun Melsungen AG v. Terumo Medical Corp.*,
    778 F. Supp. 2d 506 (D. Del. 2011).................................................................23

*Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*,
    C.A. No. 02-1694-GMS, 2008 WL 4745882 (D. Del. Oct. 29, 2008).........................20, 31, 33

*Broadcom Corp. v. Emulex Corp.*,
    732 F.3d 1325 (Fed. Cir. 2013) .......................................................................19

*Cognex Corp. v. Microscan Sys., Inc.*,
    2014 WL 2989975 (S.D. N.Y. June 30, 2014) .................................................22

*Covidien Sales LLC v. Ethicon Endo-Surgery, Inc.*,
    2014 WL 5242872 (D. Conn. Oct. 15, 2014).....................................................25

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ..............................................................18, 22, 32

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006).....................................................................................3, 29

*EcoNova Inc. v. DPS Utah*,
    No. 12-cv-174, 2012 WL 5944257 (D. Utah Nov. 28, 2012) ...............................27

*Finjan Software, Ltd. v. Secure Computing Corp.*,
    06-cv-369-GMS, 2009 WL 2524495 (D. Del. Aug. 18, 2009) .........................18, 29

*Fisher-Price, Inc. v. Safety 1st, Inc.*,
    279 F. Supp. 2d 526 (D. Del. 2003)..................................................................33

- iii -

*Golden Hour Data Sys., Inc. v. emsCharts, Inc.*,
    No. 06-cv-381, 2014 WL 8708239 (E.D. Tex. Mar. 31, 2014)...............................................27

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    No. 07-cv-00331, 2013 WL 3043668 (D. Nev. June 17, 2013) ...............................................30

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    No. 07-cv-00331, 2013 WL 3043668 (D. Nev. June 17, 2013) ...............................................29

*Hydrodynamic Indus. Co. v. Green Max Distributors, Inc.*,
    No. 12-cv-5058, 2014 WL 2740368 (C.D. Cal. June 16, 2014)...............................................24

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .........................................................................................3, 28

*Invista N. America S.A.R.L. et al. v. M & G USA Corp.*,
    35 F. Supp. 3d 583 (D. Del. 2014).................................................................................18, 24

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    520 F. Supp. 2d 537 (D. Del. 2007)........................................................................................18

*Mentor Graphics Corp. v. Eve-USA, Inc.*,
    2015 WL 1224077 (D. Or. Mar. 17, 2015) ......................................................................22, 23

*MercExchange, LLC v. eBay, Inc.*,
    500 F. Supp. 2d 556 (E.D. Va. 2007).....................................................................................27

*Merial Ltd. v. Cipla Ltd.*,
    681 F.3d 1283 (Fed. Cir. 2012) .............................................................................................22

*Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*,
    788 F. Supp. 2d 71 (E.D.N.Y. 2011)......................................................................................21

*Novozymes A/S v. Genecor Int'l, Inc.*,
    474 F. Supp. 2d 592 (D. Del. 2007)........................................................................................19

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc. et al.*,
    03-cv-309-LPS, 2014 WL 2960035 (D. Del. June 30, 2014)...........................................passim

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) .............................................................................................32

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    702 F.3d 1351 (Fed. Cir. 2012) .............................................................................................19

*Research Found. of State Univ. of New York v. Mylan Pharm. Inc.*,
    723 F. Supp. 2d 638 (D. Del. 2010)........................................................................................33

*Robert Bosch LLC v. Pylon Manuf. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ................................................................................. 19, 26, 32

*Tivo Inc. v. EchoStar Comm'ns Corp.*,
   446 F. Supp. 2d 664 (E.D. Tex. 2006) ...................................................................................20

*TransPerfect Global, Inc. v. MotionPoint Corp.*,
   No. 10-cv-2590, 2014 WL 6068384 (N.D. Cal. Nov. 13, 2014) ............................................26

*TruePosition Inc. v. Andrew Corp.*,
   568 F. Supp. 2d 500 (D. Del. 2008) ......................................................................................19

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir 2007) .......................................................................................21, 22

## I.      INTRODUCTION

The jury's verdict confirmed that Zerto, Inc. ("Zerto") – a company founded by two former high-ranking EMC executives to compete directly with EMC – built its product on EMC's patented technology without consent.  For nearly four years, Zerto has unlawfully and unfairly competed against EMC using EMC's patented technology.   A permanent injunction should be entered to stop Zerto's unlawful conduct.

Zerto's unauthorized use of EMC's patented technology irreparably harms EMC in ways that money damages cannot remedy.  This harm includes lost market share in the nascent market for virtual machine replication software, lost downstream and future sales in that market, ▮▮▮ ▮▮▮, and diminished industry reputation as an innovator.  The irreparable harm to EMC will continue absent an injunction.  Indeed, even in the face of a jury verdict finding that Zerto infringed four EMC patents, Zerto continues today to market its infringing software to potential EMC customers.

The balance of hardships and the public interest favor EMC.  In stark contrast to the irreparable harm EMC has suffered and continues to suffer, the only hardship Zerto will suffer – an inability to continue infringing EMC's patents – is of Zerto's own making.  Granting EMC an injunction to halt Zerto's unlawful conduct will promote the strong public interest in enforcing patent rights and rewarding innovators for their risk-based investments.

EMC's patent rights have been and continue to be violated by a direct competitor that is unlawfully using EMC's patented technology to compete against EMC.  The principles of equity strongly favor injunctive relief to prevent further infringement.  EMC thus respectfully requests that the Court enter a permanent injunction.

## II.     NATURE AND STAGE OF THE PROCEEDINGS

EMC sued Zerto in July 2012, alleging that Zerto infringed three patents, including U.S. Patent No. 7,577,867 ("the '867 patent").  D.I. 1.  In August 2013, EMC amended its original complaint.  D.I. 64.  The amended complaint withdrew two of the originally asserted patents, maintained EMC's allegations that Zerto infringed the '867 patent, and added allegations that Zerto infringed four additional EMC patents, U.S. Patents No. 6,073,222 ("the '222 patent), 7,603,395 ("the '395 patent"), 7,971,091 ("the '091 patent"), and 7,647,460 ("the '460 patent").

On May 8, 2015, following a two-week trial on the merits, the jury returned a unanimous verdict that (a) Zerto directly infringes claim 45 of the '867 patent, (b) Zerto's customers directly infringe claim 38 of the '460 patent, claim 2 of the '395 patent and claim 5 of the '091 patent, (c) Zerto contributes to its customers' infringement of claim 38 of the '460 patent, claim 2 of the '395 patent, and claim 5 of the '091 patent, (d) Zerto's customers did not directly infringe claim 1 of the '222 patent, (e) Zerto did not demonstrate that any asserted claim was invalid, and (f) awarding EMC $585,783 in damages.  D.I. 212.  The Court entered judgement consistent with the jury's verdict on May 21, 2015.  D.I. 213.

## III.     SUMMARY OF THE ARGUMENT

EMC requests that the Court permanently enjoin Zerto from making, using, selling, or offering to sell within, and/or importing into, the United States, the versions of its Zerto Virtual Replication software found to infringe EMC's patents (i.e., versions 1.0, 2.0, 3.0, 3.1 and 3.5) and any product not colorably different therefrom, including the recently-released version 4.0.[1]

---

[1] Zerto released version 4.0 less than a week after its CEO testified that Zerto "has not made changes because of the lawsuits."  T.T. (Ziv Kedem) at 864:11-15; Decl. of Nathan R. Speed ("Speed Decl."), Ex. HH (May 5, 2015 press release announcing 4.0).  Documents describing version 4.0 confirm that it includes the same infringing features as prior versions.  Speed Decl., Ex. II at 3 ("ZVR allows for application-consistent checkpoints that leverage VSS."); Ex. JJ at 4 (figure showing replication between VRAs over a network cloud); *Id.* at 6 (describing use of IP).

EMC is entitled to a permanent injunction if it can show that: "(1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be 'disserved' by a permanent injunction." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  EMC satisfies all four factors.

(1)     Zerto's unauthorized use of EMC's patented technology has caused and is causing EMC irreparable harm, including loss of market share, loss of future and downstream sales, ██ ██ and a diminished reputation as an innovator.

(2)     There is no adequate legal remedy to compensate EMC for Zerto's continued infringement.

(3)     The balance of hardships weighs in favor of granting an injunction.  In contrast to the irreparable harm that EMC has suffered and will continue to suffer absent an injunction, any harm Zerto suffers is a result of its decision to start a business founded on EMC's technology.

(4)     An injunction enforcing EMC's right to exclude Zerto from infringing its valid patents serves the public interest by advancing the statutory purpose of awarding inventors a limited period of exclusivity for their innovative technology.

## IV.     STATEMENT OF FACTS

### A.     Ziv Kedem and Oded Kedem Left EMC to Found Zerto, a Company that Directly Competes with EMC

In May 2006, EMC purchased Kashya Ltd. ("Kashya") for $153 million.  D.I. 115 ¶ 22. Kashya developed enterprise-class data protection and replication software.  D.I. 64 ¶ 18; D.I. 115 ¶ 18.  The Kashya software became the replication engine for an EMC data protection product called "RecoverPoint."  D.I. 64 ¶ 23; D.I. 115 ¶ 23.

As part of the Kashya acquisition, EMC acquired the rights to Kashya's technology and also retained Kashya employees, including Ziv Kedem who became the Chief Technology Officer for EMC's RecoverPoint division and Oded Kedem who eventually became the Director of Engineering for the RecoverPoint division. D.I. 64 ¶¶ 4, 24-26; D.I. 115 ¶¶ 4, 24-26. Ziv Kedem, Oded Kedem and the rest of Kashya's employees became part of EMC's software group at EMC Israel Development Center Ltd ("EIDC"). D.I. 64 ¶ 24; D.I. 115 ¶ 24.

Ziv Kedem left EMC in January 2007. D.I. 64 ¶ 36; D.I. 115 ¶ 36. Oded Kedem stayed longer, leaving EMC in October 2009. D.I. 64 ¶ 38; D.I. 115 ¶ 38. ██████████████

████████████████████████████████████████████

██████████████████████████

While Oded Kedem was at EMC and had lead responsibility for its RecoverPoint product as its Director of Engineering, he and his brother Ziv Kedem were speaking to venture capitalists about funding Zerto Ltd. ("LTD") to compete directly with RecoverPoint. D.I. 64 ¶ 40; D.I. 115 ¶ 40; T.T. (Oded Kedem) at 941:2-4.[2] LTD was founded by the Kedem brothers one month after Oded Kedem left EMC. *Id.* In addition to being its founders, Ziv Kedem serves as LTD's Chief Executive Officer and Oded Kedem serves as its Chief Technology Officer. D.I. 18 ¶ 7.

In May 2011, LTD formed Zerto as its wholly-owned subsidiary. D.I. 18 ¶ 8; D.I. 64 ¶¶ 41, 44; D.I. 115 ¶ 41, 44. Zerto markets, sells, and offers for sale in the United States and imports into the United States the Zerto Virtual Replication software ("ZVR") that LTD designs and develops and that the jury found infringes four EMC patents. D.I. 64 ¶¶ 49-50, 52; D.I. 115 ¶¶ 49-50, 52. ZVR is a "hypervisor-based" data replication and recovery software product that competes directly with EMC's products. *See, e.g.*, Speed Decl., Ex. E at EMC_7006-08.

---

[2]  Portions of the trial transcript cited within this memorandum are provided as Exhibit A to Speed Decl.

**B.      EMC and Zerto Compete Directly in the Market for Replicating and Recovering Virtual Machines**

**1.      EMC Offers Products that Replicate and Recover Virtual Machines**

EMC's RecoverPoint product line is a family of data protection products that helps companies replicate and recover their data, including data generated by virtual machines. Declaration of Hank Chen ("Chen Decl."), ¶ 3.  The RecoverPoint family includes traditional RecoverPoint and RecoverPoint for Virtual Machines ("RecoverPoint for VMs").  *Id.*

Traditional RecoverPoint protects storage LUNs[3] and provides local and/or remote data replication over any distance, as well as continuous data protection ("CDP") technology for any point-in-time data recovery.  *Id.*, ¶ 4.  Architecturally, traditional RecoverPoint consists of a management GUI, either a physical or virtual RecoverPoint Appliance, and a write splitter embedded in an EMC storage array.  *Id.*, ¶ 5.  When changes are made to protected data on an EMC storage array, the write splitter makes a copy of the changed data, and the copy is transferred by a RecoverPoint Appliance to a companion appliance at a remote site where it is stored.  *Id.*  A CDP journal at the remote site can be used to roll back the data to an earlier point in time, such as seconds before a data corruption event occurred.  *Id.*

Although it has undergone changes over the years, EMC has sold traditional RecoverPoint since it acquired Kashya in May 2006.  *Id.*, ¶ 6.  After EMC acquired Kashya in May 2006, it incorporated Kashya's technology into traditional RecoverPoint.  D.I. 64 ¶ 23; D.I. 115 ¶ 23; Speed Decl., Ex. B ("Kashya also brings its market-leading continuous data protection (CDP) technology to EMC to be used as the engine in future releases of EMC RecoverPoint™ software.").

---

[3] A LUN ("logical unit") is a logical grouping of storage devices that appear to host computers and software applications to be a single storage device even though the LUN can be split among multiple devices or multiple storage arrays.  Chen Decl., ¶ 4.

RecoverPoint for VMs is a software-only product that protects virtual machines with local and/or remote replication and uses CDP technology to recover protected virtual machines to any point-in-time.  Chen Decl., ¶ 10.  The software supports both synchronous and asynchronous replication, and can perform the replication over any distance.  *Id*.  Architecturally, RecoverPoint for VMs uses a virtual RecoverPoint Appliance, a write splitter embedded in the ESX/ESXi hypervisor, and a plug-in to the VMware vCenter.  *Id*., ¶ 11.  RecoverPoint for VMs replicates data from a protected site to a local site in a manner similar to traditional RecoverPoint except that a copy of the changed data is made in the ESX/ESXi hypervisor, not in an EMC storage array.  *Id*.  EMC made the software available to some customers as early as August 2014 and formally released it on November 17, 2014.  *Id*., ¶ 9.

RecoverPoint for VMs and traditional RecoverPoint share a common architecture and use the same replication engine.  *Id*., ¶ 12; Speed Decl., Ex. C ("[RecoverPoint for VMs] is built on the robust RecoverPoint engine, the proven market leader in replication and disaster recovery.").  Customers can (and do) use both products to protect virtual machines, and customers most commonly use the RecoverPoint products to protect Tier-1 or "mission critical" applications.  *Id*.  One difference between the two products is the ability of RecoverPoint for VMs to protect virtual machines with VM-level granularity (i.e., on a per-VM basis), while traditional RecoverPoint protects virtual machines with LUN-level granularity (i.e., on a per-LUN basis).  *Id*., ¶ 14.

### 2.   Zerto's ZVR Replicates and Recovers Virtual Machines.

Like EMC, Zerto is in the business of replicating and recovering virtual machines.  Indeed, this is Zerto's sole business.  Zerto markets ZVR as the "industry's first hypervisor-based replication solution for tier-one applications."  Speed Decl., Ex. D at EMC_6987.

Like RecoverPoint for VMs, ZVR protects virtual machines with VM-level granularity. Speed Decl., Ex. E at EMC_7007-08.  Also like RecoverPoint for VMs, ZVR uses a virtual appliance (a "Virtual Replication Appliance" or "VRA"), a write splitter embedded in the ESX/ESXi hypervisor, and a plug-in to the VMware vCenter.  Speed Decl., Ex. F at ZERTO_55988; T.T. (Ian Jestice) at 273:20-274:4, 283:25-284:19 (describing ZVR).  Also like RecoverPoint for VMs, ZVR replicates data from a protected site to a remote site, and uses a CDP journal to allow users to recover virtual machines to any point-in-time.  Speed Decl., Ex. D at EMC_6988 ("Journal-based recovery with the capability to recover to a historic point in time."); Ex. G at EMC_7161 ("Journal CDP History").  Finally, also like RecoverPoint for VMs, ZVR is intended to protect Tier-1, mission-critical applications.  Speed Decl., Ex. G at EMC_7160 ("Protecting Tier-1 Applications with Zerto"); Ex. D at EMC_6987.

### 3. EMC and Zerto Are Direct Competitors

From the day Zerto was founded, its CEO Ziv Kedem believed that the company would compete with EMC and its RecoverPoint products.  T.T. (Ziv Kedem) at 868:2-6.  In addition to being founded by two former EMC employees who were directly responsible for the RecoverPoint product,  Zerto opened its U.S. office in EMC's backyard in Boston and hired individuals from EMC to head up Zerto's client facing operations, including Zerto's Director of Product Marketing Jennifer Gill and Zerto's Vice President of Global Sales Paul Zeiter.  Speed Decl., Ex. H (Gill Depo.) at 12:11-19; Ex. I (Zeiter Depo.) at 10:17-11:6.  Zerto's CEO (Ziv. Kedem).  Zerto's Chief Technology Officer (Oded Kedem), its Direct of Product Marketing (Jennifer Gill), its Vice President of Global Sales (Paul Zeiter), and its damages expert (Russell Parr) all agree that EMC and Zerto are competitors.  T.T. (Oded Kedem) at 921:22-922:2; *Id.* (Jennifer Gill) at 579:10-14, 583:4-16; *Id.* (Paul Zeiter) at 601:15-17; *Id.* (Russell Parr) at 1508:11-14.

EMC and Zerto compete in the broader data protection market, and also the more specific emerging market for virtual machine replication and recovery – what Zerto calls the "hypervisor-based replication" market.  In the broader data protection market, ZVR competes with both traditional RecoverPoint and RecoverPoint for VMs.  Chen Decl., ¶ 17.  The two companies are not alone in this market as other companies also offer data protection products.  *Id.*  Despite the presence of other competitors in this market, Zerto has focused much of its marketing efforts on convincing existing and potential EMC customers to purchase ZVR instead of EMC's RecoverPoint products, and Zerto has succeeded.  *See infra* Section IV.B.4.

Since the release of RecoverPoint for VMs in November 2014, EMC and Zerto also compete head-to-head in the emerging hypervisor-based replication market.  Chen Decl., ¶ 18.  Even Zerto's damages expert – Russell Parr – conceded this was true.  T.T. (Russell Parr) at 1508:11-14 ("Q. When did [EMC and Zerto] become direct head-t-head competitors? A. Well, I don't know the exact date. But I think there is [an] indication that EMC started to have a product available in November 4th, 2014").  The hypervisor-based replication market was developed in 2011 and is a distinct sub-market within the broader data protection market.  Chen Decl., ¶ 18.  The defining features of this sub-market are (1) the ability to replicate and recover virtual machines with VM-level granularity, and (2) achieving this ability using techniques suitable for large businesses.  *Id.*; ████████████████████████████████

████████████████████████████████████████

Although other data protection products can replicate and recover data for virtual machines, only VMware competes with EMC and Zerto in the hypervisor-based replication market because others either do not provide VM-level granularity, or do so using inferior techniques that exhibit significant drawbacks in an enterprise environment.  Chen Decl., ¶ 19.

For example, some companies offer array-based and appliance-based replication products that replicate storage LUNs, not virtual machines, and therefore cannot replicate data with VM-level granularity.[4]  Speed Decl., Ex. E at EMC_7005-06 (describing array-based and application-based replication); Ex. K at EMC_7165 (same); ███████████████.  Other companies offer products that replicate with VM-level granularity, but require either using snapshots ("snapshot-based replication") or installing software in each protected virtual machine ("host or guest-based replication"), two techniques that are not suitable for large-scale use.  Speed Decl., Ex. E at EMC_7005 (describing disadvantages of host/guest-based replication); Ex. K at EMC_7169 (describing disadvantages of host/guest-based and snapshot-based replication); █████ ██████████████████████████████████████████████; Chen Decl., ¶ 19.

The only company that competes with EMC and Zerto in the hypervisor-based replication market is EMC's subsidiary VMware, with its vSphere Replication product.  Chen Decl., ¶ 20; T.T. (Jennifer Gill) at 583:4-16 (identifying vSphere Replication and RecoverPoint for VMs as Zerto's only competitors in the hypervisor-based replication market).  However, vSphere Replication is not a direct competitor because it is not designed to work with Tier-1 applications. Instead, as VMware itself advertises, vSphere Replication is designed to replicate and recover virtual machines running only Tier-2 applications.  Speed Decl., Ex. K at EMC_7169 ("[vSphere Replication] was designed for SMB [small and medium-sized business] and branch offices and built to replicate second-tier applications."); Speed Decl., Ex. L at 2 ("vSphere Replication provides cost-efficient and simple replication for smaller sites and Tier 2 applications.").

---

[4] Traditional RecoverPoint is an appliance-based solution and is therefore not a hypervisor-based replication product.  Chen Decl., ¶ 5.  As noted above, traditional RecoverPoint competes with ZVR in the broader data protection market.

RecoverPoint for VMs and ZVR, by contrast, are designed to replicate and recover virtual machines running Tier-1 applications such as Microsoft Exchange or SQL Server.  Chen Decl., ¶ 21.  Tier-1 applications are applications that are critical to a business's day-to-day operations, while Tier-2 applications are typically less important.  *Id.*  Because vSphere Replication was not built to protect Tier-1 applications, companies seeking an enterprise-class hypervisor-based replication product have only two choices: RecoverPoint for VMs or ZVR.  *Id.*; ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

### 4.    Zerto Markets ZVR as an Alternative to EMC's RecoverPoint

Zerto specifically markets its product as an alternative to EMC's RecoverPoint products. Zerto's Director of Product Marketing Jennifer Gill testified that she uses a marketing document called ████████████████████████  That document compares for customers the cost of licensing ZVR to the cost of licensing traditional RecoverPoint.  T.T. (Jennifer Gill) at 571:14-572:18; Speed Decl., Ex. N.  She explained that the goal of the document is to show that ZVR costs less than traditional RecoverPoint.  *Id.* at 573:16-18.  Ms. Gill testified that Zerto created a similar document for only one other competitor.  *Id.* at 574:20-23.

Ms. Gill also described an internal Zerto document called "Competitive Comparison" used to "educate[]" the Zerto sales team on how to market ZVR against traditional RecoverPoint. T.T. at 580:22-581:8; Speed Decl., Ex. O.  That document and others like it give the Zerto sales team a go-to list of ZVR's purported advantages over traditional RecoverPoint.  *Id.* at 582:8-11; ████████████████████████████████████████.  Ms. Gill testified that Zerto had not created a similar document for use against IBM or HP, despite considering both of them "competitors" in the data protection market.  *Id.* at 582:23-583:3.

Zerto's customer-facing materials repeatedly single out RecoverPoint as a supposedly inferior solution to ZVR. For example, in a white paper comparing ZVR with "common replication technologies," Zerto specifically identifies traditional RecoverPoint as an "appliance-based replication solution" and lists several purported "disadvantages" of using traditional RecoverPoint. Speed Decl., Ex. E at EMC_7005-06. ████████████████████ ████████████████████████████████████████████████ ██████████████████████████ On its website, Zerto includes customer testimonials, including one in which a customer – Rapidparts – contrasts ZVR with RecoverPoint. Speed Decl., Ex. R at EMC_194854. No other customer testimonial mentions a competitor's replication product by name.

### C.   **EMC Is Losing Customers to Zerto and** ████████████████████ ███████████████████████████████

#### 1.   Lost Customers

Ms. Gill testified that Zerto maintains an internal document that tracks, among other things, which competitor solutions Zerto customers considered using or were using prior to licensing ZVR. T.T. at 575:12-577:1; Speed Decl., Ex. S. The document identifies ███████ ███████ Speed Decl., Ex. S. ████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████

██  The Rapidparts' customer testimonial discussed above demonstrates another customer –

Rapidparts – that EMC lost to Zerto.  Speed Decl., Ex. R at EMC_194854.

EMC has also tracked RecoverPoint for VM sales opportunities that it has lost to Zerto.

As of the date of this motion, ███████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██    ████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████, ████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████  ████████████████████████

███████████████████████████████████████████████████



### D.     The Patented Features Drive Consumer Demand for ZVR

The four infringed patents cover at least two features of ZVR: (1) creating application-consistent checkpoints using Microsoft Volume Shadow Copy Service ("VSS") (the Rokicki patents and the '867 patent)[6] and (b) mirroring data between storage systems over an IP-network ('460 patent).  T.T. (Ian Jestice) at 334:9-12 (Rokicki patents); 421:1-3 ('867 patent); 416:13-417:11 ('460 patent).  These features drive consumer demand for ZVR.

---

[6] The infringed claims of the Rokicki patents recite a replication application "configured to" generate event markers that correspond to a quiescent state for an application.  As Mr. Jestice explained, infringing these patents does not require generating a VSS checkpoint, it only requires installing ZVR because the software is always "configured to" create VSS checkpoints even before one is actually created.  T.T at 341:21-342:4, 366:18-367:13.  The infringed claim of the '867 patent (claim 45) recites a computer-readable medium, and it is infringed by the combination of ZVR and a piece of software, the ZertoVssAgent, both of which are offered for sale, sold, and stored together.  T.T. at 388:3-21, 401:19-22, 720:3-8, 721:20-722:1.

###### 1.   Zerto's Customers Demand that ZVR Have the Ability to Create VSS Checkpoints, and Zerto Markets this Feature Heavily

The first patented feature is ZVR's ability to create VSS checkpoints, allowing recovery

to a point-in-time when the data was "application consistent." T.T. (Ian Jestice) at 353:19-

355:25. Ziv Kedem testified at deposition that ███████████████████████████

███████████████████████████████████ He explained that ████████████

█████████████████████████████████████████████████████████████████

Similarly, Oded Kedem testified at deposition that ███████████████████████

███████████████████████████████████ Customers demand

application-consistent data recovery in the "Tier-1" or "mission-critical" applications market

where Zerto competes directly with EMC. Chen Decl., ¶ 43.

Zerto advertises ZVR's ability to create VSS checkpoints in its marketing materials. For

example, a significant portion of Zerto's white paper "Protect Applications, Not Just Data" is

devoted to describing how ZVR "enables adding application-consistent checkpoints" using VSS.

Speed Decl., Ex. G. Similarly, Zerto's corporate blog identifies "application consistency" as one

of two "keys to true disaster recovery." Speed Decl., Ex. V at EMC_195721.

Zerto customers confirm application-consistent recovery as a key feature of ZVR. Speed

Decl., Ex. R at EMC_194852 (ING: "ZVR has everything we need to effectively protect our

production workloads – simple DR testing and application consistent recovery."); *Id.* at

EMC_194849 (Mitsubishi Chemical Holdings Group: "Zerto Virtual Replication was the only

solution we found that delivered very aggressive service levels, provided application

consistency..."). EMC's damages expert Philip Green concluded, after reviewing Zerto

customer surveys and marketing materials, that application-consistent data recovery was an

important feature of ZVR. T.T. at 656:12-16, 659:1-7.

## 2. The Ability to Mirror Data Between Storage Systems Using an IP-Network Is Essential to ZVR's Commercial Desirability

The second patented feature is ZVR's ability to mirror data between storage systems using an IP-network. As Mr. Jestice explained at trial, this feature makes ZVR a more cost-effective solution because it allows customers to leverage pre-existing IP-networks instead of deploying new, and costly, dedicated point-to-point links to perform data mirroring. T.T. at 416:18-418:6. As Zerto's expert, Dr. Erez Zadok, explained, using a dedicated point-to-point link is the equivalent of buying a highway for your own personal use. T.T. at 1176:22-1177:2 ("Basically, point-to-point links are very expensive because you basically lease the line or sort of like, you know, buy part of the highway so you can drive to work and nobody else can. That would be great if we can all afford it, but it's very expensive."). The patented feature allows customers to use pre-existing shared "highways," resulting in significant savings. *Id.*

As an alternative, Mr. Jestice explained that Zerto could re-design ZVR to mirror between protected virtual machines, rather than between storage systems. T.T. at 423:20-22. However, this re-design would turn ZVR into a "host or guest-based" mirroring system, which Zerto documents critique as unsuitable for the modern business environments for which ZVR is marketed. For example, a Zerto white paper explains that guest-based mirroring "increases overhead and greatly limits scalability in large environments. Additionally, it takes away processing power from the application that is running your business." Speed Decl., Ex. K at EMC_7169. Another Zerto white paper explains that guest-based mirroring "solutions are not fit for enterprises" because they are "impossible to implement and manage in high-scale enterprise environments." Speed Decl., Ex. E at EMC_7005. Mr. Green's review of Zerto's customer testimonials and marketing materials led him to conclude that mirroring between storage systems over the network cloud is important to Zerto's market position. T.T. 651:11-652:2, 654:9-12.

### E.   The Nature of the Virtual Machine Replication Software Market Makes the Scope of EMC's Harm Difficult to Quantify

The nature of the hypervisor-based replication market makes quantifying the harm that EMC suffers from Zerto's unlawful competition impractical.

First, sales in the hypervisor-based replication market are not one-off sales.  Chen Decl. at ¶ 35.  Customers tend to purchase a license to protect a certain number of virtual machines initially, and then as the customer's virtualization environment grows, the number of virtual machines that the customer wishes to protect increases.  *Id*.  Customers typically use the incumbent provider's software to protect these additional virtual machines.  *Id*.  Accordingly, the harm from an initial lost sale for only a small number of virtual machines could be much more significant than the initial lost revenue, as the customer may greatly increase the number of virtual machines that it protects over the course of the relationship with the incumbent provider.  *Id*.  The downstream revenue lost due to a single lost opportunity is therefore difficult to calculate because the customer's decision to increase the number of virtual machines it protects occurs over time and typically without competitive bidding.  *Id*.  Moreover, by losing the opportunity to secure incumbency status with customers, EMC loses the ability to reap the intangible competitive advantages that incumbent providers gain.  *Id.*, at ¶ 36.

Second, consistent with typical business models in the software market, both EMC and Zerto generate significant revenue from maintenance and support contracts.  *Id.*, at ¶ 37.  Zerto, for example, annually generates roughly $214 per virtual machine it protects from its maintenance and support contracts.  T.T. (Phil Green) at 643:6-16; Speed Decl., Ex. W.

Maintenance and support contracts vary in levels of support and cost.  Zerto, for example,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ EMC also offers maintenance and support contracts with different levels of support and different costs. Chen Decl. at ¶ 38. Revenue from maintenance and support contracts therefore varies widely depending upon the level of service a customer selects and the number of virtual machines the customer chooses to protect over the course of the contract. *Id.* Given the variability in maintenance and service revenue, quantifying the amount lost due to a single lost opportunity is not possible.

Third, a key aspect of virtual machine replication software is its "storage agnostic" nature, meaning that the software supports any storage protocols and can therefore work with any type of underlying physical storage devices or arrays. *Id.*, at ¶ 39. Because the software is "storage agnostic," both EMC and Zerto can market the software to companies that use competitors' storage devices or arrays. *Id.* The ability to market the software to companies that use competitors' storage products is particularly significant (and valuable) to EMC because EMC offers other data protection and storage products beyond RecoverPoint for VMs. *Id.* Therefore, RecoverPoint for VMs provides EMC with an avenue not only to generate revenue from licenses of RecoverPoint for VMs; it also provides EMC an opportunity to displace the incumbent storage product provider. *Id.* A lost opportunity to sell RecoverPoint for VMs is also a lost opportunity to sell one of EMC's other data storage products to that same customer. *Id.*

## V.   ARGUMENT

### A.   Zerto's Infringement Causes EMC Irreparable Harm

Zerto is unfairly using EMC's patented technology to compete against EMC in both the data protection market and the narrower hypervisor-based replication market. This unfair competition has caused and continues to cause EMC irreparable harm. Monetary relief cannot fully cure this harm. Without an injunction, the irreparable harm to EMC will continue.

### 1. EMC Has Lost and Continues to Lose Market Share to Its Direct Competitor Zerto

Zerto's CEO, CTO, Direct of Product Marketing, Vice President of Global Sales, and damages expert all concede that EMC and Zerto are direct competitors. T.T. (Ziv Kedem) at 868:2-6; (Oded Kedem) at 921:22-922:2; *Id.* (Jennifer Gill) at 579:10-14, 583:4-16; *Id.* (Paul Zeiter) at 601:15-17; *Id.* (Russell Parr) at 1508:11-14. They compete against each other and other companies in the data protection market, and compete against only each other in the hypervisor-based replication sub-market. Chen Decl., ¶¶ 17-18; *supra* Section IV.B.3. Zerto's focus on EMC and its RecoverPoint product in advertising materials and internal sales training documents underscores the companies' competitive relationship. *See supra* Section IV.B.4.

"Where two companies are in competition against one another, the patentee suffers the harm – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) (reversing denial of injunction). Courts routinely grant injunctions in circumstances like those of the present case. *See Finjan Software, Ltd. v. Secure Computing Corp.*, 06-cv-369-GMS, 2009 WL 2524495, *10 (D. Del. Aug. 18, 2009), *aff'd in part, rev'd in part on other grounds* 626 F.3d 1197 (Fed. Cir. 2010) (granting injunction where the patent owner and the infringer were direct competitors for the same customers); *Invista N. America S.A.R.L. et al. v. M & G USA Corp.*, 35 F. Supp. 3d 583, 609-10 (D. Del. 2014) (granting injunction and finding irreparable harm established where the patent owner and the infringer were direct competitors in a market that was a subset of a larger market); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 520 F. Supp. 2d 537, 558 (D. Del. 2007), *aff'd in part, rev'd in part on other grounds*, 579 F.3d 1363 (Fed. Cir. 2009) (granting injunction and finding that patent owner suffered irreparable harm where the infringer was the "only competitor" in the relevant market);

*TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 531-32 (D. Del. 2008) (granting injunction and finding irreparable harm where plaintiff and defendant were the only two competitors in relevant market); *Novozymes A/S v. Genecor Int'l, Inc.*, 474 F. Supp. 2d 592, 612-13 (D. Del. 2007) (granting injunction: "These are head-to-head competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use of proprietary technology.").

There is ample evidence confirming that EMC and Zerto compete for the same customers, and that EMC has lost and continues to lose customers to Zerto. ██████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████ Zerto's website includes customer testimonials, at least one of which explicitly mentions that a specific customer chose ZVR over RecoverPoint.  Speed Decl., Ex. R at EMC_194854. ████████████

██████████████████████████████████████████████

████████████████████████████████████

██████████████████████████

EMC's loss of market share and customers due to Zerto's infringing conduct further supports a finding that it has suffered irreparable harm.  *Robert Bosch LLC v. Pylon Manuf. Corp.*, 659 F.3d 1142, 1153-54 (Fed. Cir. 2011); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351. 1363 (Fed. Cir. 2012) (reversing district court's finding of no irreparable harm and holding that evidence of lost sales "squarely supports a finding of irreparable harm"); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1338 (Fed. Cir. 2013)

(affirming injunction: "The district court determined that Broadcom and Emulex were competitors and that Broadcom lost market share while Emulex gained it – thus Broadcom established irreparable harm."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 03-cv-309-LPS, 2014 WL 2960035, *1 (D. Del. June 30, 2014) (granting injunction and finding irreparable harm where patent owner "has already lost sales"); *Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*, C.A. No. 02-1694-GMS, 2008 WL 4745882, *3 (D. Del. Oct. 29, 2008) (granting injunction and finding irreparable harm where patent owner identified specific customer accounts that it lost to infringer).

The harm EMC suffers from its loss of market share is also irreparable because the hypervisor-based replication market is a nascent market, and EMC is actively losing market share during the market's critical formation period.  *Tivo Inc. v. EchoStar Comm'ns Corp.*, 446 F. Supp. 2d 664, 669-70 (E.D. Tex. 2006) *aff'd in part, rev'd in part on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008) ("Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm – Plaintiff is losing market share at a critical time in the market's development, market share that it will not have the same opportunity to capture once the market matures.").

### 2.    EMC Is Losing Future Downstream Sales

The fact that EMC has lost and will continue to lose downstream sales due to Zerto's infringing conduct is certain.  The extent of the harm EMC will suffer from the loss of those downstream sales, however, cannot be quantified with reasonable certainty.

Customers in the data protection market are "sticky," meaning that they tend to remain customers of the company from which they initially obtain their data protection.  Chen Decl., ¶ 36.  While an initial sale of ZVR or RecoverPoint for VMs results in a quantifiable loss of initial revenue, there is no practical way to quantify several different sources of downstream

revenue: (1) licensing revenue from additional virtual machines a customer protects over the life of its relationship with EMC or Zerto, (2) maintenance and service revenue over the life of the relationship, and (3) revenue from sales of related data protection services or products. *Id.*, ¶ 35.

EMC has lost and is losing an immeasurable amount of downstream revenue. These losses are causing EMC harm that is irreparable. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir 2007) (affirming injunction and recognizing "lost opportunities to sell other services to lost customers" as a form of irreparable harm); *Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*, 788 F. Supp. 2d 71, 75 (E.D.N.Y. 2011) (granting permanent injunction and finding irreparable harm based in part on lost opportunities for repeat sales); *see also Apple Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1337 (Fed. Cir 2012) (O'Malley, concurring) ("Because the loss of customers and the loss of future downstream purchases are difficult to quantify, these considerations support a finding that monetary damages would be insufficient to compensate Apple.").

*Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012) (affirming injunction and recognizing "price erosion" as a form of irreparable harm); *Verizon Servs.*, 503 F.3d at 1310 (same); *Power Integrations, Inc.*, 2014 WL 2960035 at *1-2 (granting injunction and finding irreparable harm where patent owner has "seen its prices erode"); *Mentor Graphics Corp. v. Eve-USA, Inc.*, 2015 WL 1224077, *1 (D. Or. Mar. 17, 2015) (granting injunction and finding irreparable harm in part due to price erosion); *Cognex Corp. v. Microscan Sys., Inc.*, 2014 WL 2989975, *1 (S.D. N.Y. June 30, 2014) (granting injunction and finding irreparable harm in part "because sufficient evidence demonstrates that Cognex faces a serious risk of at least price erosion and diminished market share if defendants are permitted to infringe plaintiffs' patent").

### 4.    Zerto's Infringement Diminishes EMC's Reputation as an Innovator

EMC suffers irreparable harm from more than just lost sales, displaced market share and ███████. Zerto's continued use of EMC's patent technology diminishes EMC's reputation as an innovator in the data protection market, a recognized form of irreparable harm. *Douglas Dynamics LLC*, 717 F.3d at 1344-45 (reversing denial of permanent injunction and finding erosion in reputation constitutes irreparable harm).

As EMC's Vice President of Marketing, Barbara Robidoux, testified at trial, EMC "has a great track record around innovation." T.T. at 161:15-16. As Ms. Robidoux explained, "it is critical for a technology company," like EMC, "to be able to innovate." *Id.* at 166:23-25. To maintain its great track record around innovation, EMC "invest[s] about 12 percent" of its annual revenue "back into research and development." *Id.* at 167:4-7. For comparison, Ms. Robidoux explained that Apple Inc. typically invests only six percent of its annual revenue into research and development. *Id.* at 167:8-13. The Patent Office has recognized EMC's innovation, and awarded it over 4,000 patents. *Id.* (William Clark) at 967:21-25.

EMC's reputation as an innovator, however, is diminished when a company, such as Zerto, is permitted to sell products that incorporate EMC's patented technology. Zerto's infringing conduct diminishes EMC's innovator reputation, and this causes EMC harm that is not reparable. *Power Integrations*, 2014 WL 2960035 at *1 (granting junction: "The damage to Power's reputation as an innovator, price erosion, and the incumbency effects of Fairchild defeating Power for 'design-wins' cannot be fully compensated by payment of damages."); *B. Braun Melsungen AG v. Terumo Medical Corp.*, 778 F. Supp. 2d 506, 524 (D. Del. 2011) (granting injunction and finding that plaintiff's "reputation as an innovator [is] threatened without the protection of injunctive relief"); *Mentor Graphics*, 2015 WL 1224077 at *1-3 (granting injunction and finding irreparable harm in part due to the harm plaintiff suffers "when all of its supposedly innovative improvements are found in competing products").

**5.      A Causal Nexus Exists Between Zerto's Infringement and EMC's Irreparable Harm**

Proof of a "causal nexus" between a patentee's irreparable harm and the defendant's infringement may be shown with evidence "that a patented feature is one of several features that cause consumers to make their purchasing decisions" or "that the absence of a patented feature would make a product significantly less desirable." *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1364 (Fed. Cir. 2013). Here, two features of ZVR infringe four EMC patents. *See supra* Section IV.D. Consumers demand these features, and if ZVR did not include the features, it would be significantly less desirable.

The first patented feature is ZVR's ability to create VSS checkpoints. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Zerto has heavily marketed the feature, which shows Zerto's recognition of its importance. Speed Decl., Ex. G at EMC_7162 ("Zerto Virtual Replication supports Microsoft Volume Shadow Copy Service (VSS), which provides an additional checkpoint."); Speed Decl., Ex. V at EMC_195721 (identifying "application consistency" as one of the "keys to true disaster recovery"). Zerto customers, when discussing desirable aspects of ZVR, highlight its ability to recover data in application-consistent states, an ability that ZVR delivers via the VSS checkpoint feature. Speed Decl., Ex. R at EMC_194852, EMC_194849.

The ability to recover data in an application-consistent state using VSS has also driven demand for EMC's own traditional RecoverPoint. Chen Decl., ¶ 43. EMC markets the ability of traditional RecoverPoint to recover data in application-consistent states, and customers have listed it as a required functionality in requests for proposals. *Id.*, ¶¶ 44-45. Although RecoverPoint for VMs does not currently support VSS, the version of the product being released next month will, and it was added in response to consumer demand for the feature. *Id.*, ¶ 46.

The evidence is abundant that Zerto created the VSS feature in response to consumer demand and that the feature continues to drive consumer demand for ZVR. A causal nexus between the infringing feature and EMC's irreparable harm plainly exists. *Apple*, 735 F.3d at 1364 (holding that to demonstrate a causal nexus between infringement and irreparable harm a plaintiff must show a connection between the patented feature and demand for the accused product); *Hydrodynamic Indus. Co. v. Green Max Distributors, Inc.*, No. 12-cv-5058, 2014 WL 2740368, *2 (C.D. Cal. June 16, 2014) (granting an injunction and finding a causal nexus where "the patented features propelled consumer demand"); *Invista N. Am. S.A.R.L.*, 35 F. Supp. 3d at 609 (granting injunction and finding sufficient nexus between plaintiff's irreparable harm and defendant's infringement where patented feature was one basis for consumer demand); *Power*

- 24 -

*Integrations*, 2014 WL 2960035 at *2 (granting injunction and finding causal nexus where there was evidence that "customers demand that the [patented] features be included in the products supplied to them"); *Covidien Sales LLC v. Ethicon Endo-Surgery, Inc.*, 2014 WL 5242872, *12 (D. Conn. Oct. 15, 2014) (granting injunction and finding causal nexus where defendant acknowledged that the patented feature was one consumers "may prefer" and the defendant "promoted" the patented feature).

The second patented feature is ZVR's ability to mirror data between storage systems using an IP-network. This patented feature is foundational and, as discussed above, the only non-infringing alternatives open to Zerto would result in a product that is either prohibitively expensive or "unfit" for use in a modern business. *See supra* Section IV.D.2. Zerto cannot dispute these facts. Its expert derided the use of a dedicated point-to-point link as "very expensive" and the equivalent to buying a portion of a highway for your own use. T.T. (Erez Zadok) at 1176:22-1177:2. Its own documents describe "host-based" or "guest-based" mirroring as "not fit for enterprises" because they are "impossible to implement and manage in high-scale enterprise environments." Speed Decl., Ex. E at EMC_7005; *see also* Speed Decl., Ex. K at EMC_7169 (Zerto white paper explaining that "guest-based mirroring "increases overhead and greatly limits scalability in large environments.").

Similar to ZVR, both traditional RecoverPoint and RecoverPoint for VMs mirror data over IP. Chen Decl., ¶ 40. This feature is fundamental to both products because it provides customers with the ability to use pre-existing and cost-effective IP-networks. *Id.* Without the ability to mirror data over an IP-network, the RecoverPoint products would be undesirable to many customers. *Id.*, ¶ 42.

There is significant evidence that removing the ability to mirror data between storage systems using an IP-network from ZVR would result in a product that is either prohibitively expensive or indisputably "not fit" for its intended market.  A causal nexus between the infringing feature and EMC's irreparable harm plainly exists.  *Apple*, 735 F.3d at 1364 (holding that "evidence that the absence of a patented feature would make a product significantly less desirable" demonstrates a causal nexus between infringement and irreparable harm); *TransPerfect Global, Inc. v. MotionPoint Corp.*, No. 10-cv-2590, 2014 WL 6068384, *6 (N.D. Cal. Nov. 13, 2014) (granting injunction and finding a causal nexus based on testimony that the patented features were "integral parts of the system" and the accused product would be "impossible to use" with those features); *Sealant Systems International, Inc. v. TEK Global S.R.L.*, 2014 WL 1008183, *23 (N.D. Cal. Mar. 7, 2014) *rev'd in part on other grounds* No. 2014-1405, 2015 WL 3622097 (Fed. Cir. June 11, 2015) (granting injunction and finding causal nexus where accused product "could not operate" without the patented feature).

### 6.    Zerto's Ability to Pay Any Monetary Judgment is Unclear

An infringer's inability to satisfy a judgment weighs in favor of finding irreparable harm. *Robert Bosch LLC*, 659 F.3d at 1155. ███████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████          *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, No. 06-cv-381, 2014 WL

8708239, *11 (E.D. Tex. Mar. 31, 2014) (granting an injunction: "Given the substantial

uncertainty regarding emsCharts' ability to fulfill on-going royalty obligations, the Court is

uncertain that, absent an injunction, Golden Hour would be compensated at all."); *EcoNova Inc.

v. DPS Utah*, No. 12-cv-174, 2012 WL 5944257, *15 (D. Utah Nov. 28, 2012) (granting

injunction and finding irreparable harm where "the court [was] skeptical that the Defendants

would be able to satisfy a judgment").

     **B.**     **The Remedies at Law Are Inadequate to Compensate EMC**

     **1.**     **Money Damages Are Insufficient**

     The insufficiency of legal remedies to compensate EMC for Zerto's infringement is

shown by the same evidence demonstrating irreparable harm discussed above.  Irreparable injury

demonstrates the inadequacy of a legal remedy, and the concepts of "irreparable injury" and "no

adequate remedy at law" often overlap in the context of a permanent injunction. *MercExchange,

LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007) ("[T]he requisite analysis for the

second factor of the four-factor test inevitably overlaps with that of the first.").

EMC's loss of market share and customers cannot be compensated solely with monetary damages. *See i4i P'ship.*, 598 F.3d at 862 (finding that money damages would not remedy "loss of market share" because "[s]uch losses may frequently defy attempts at valuation"). Similarly, EMC's loss of downstream and future sales is an irreparable harm that money alone cannot remedy. *See Apple,* 678 F.3d at 1337 (O'Malley, concurring) ("Because the loss of customers and the loss of future downstream purchases are difficult to quantify, these considerations support a finding that monetary damages would be insufficient to compensate Apple."). ██████ ██████ and EMC's diminished reputation as an innovator are also irreparable harms that cannot be remedied with money. *See Power Integrations*, 2014 WL 2960035 at *2 (granting an injunction and finding plaintiff's "harms," including price erosion "are not reparable by remedies available at law"); *i4i Ltd. P'ship.*, 598 F.3d at 862 (finding that money damages would not remedy loss of "brand recognition" because the loss "is particularly difficult to quantify"). The harms EMC would suffer from Zerto's continued infringement could not be cured with legal remedies.

## 2. EMC's Past Licensing Practices Confirm that Money Damages Cannot Adequately Compensate EMC

EMC has a "general philosophy" that it does not license its patents except for broad cross-licenses or other strategic reasons. T.T. (William Clark) at 967:7-11. EMC's limited past licensing practices with respect to the infringed patents confirm that money damages cannot adequately compensate EMC for Zerto's infringement.

EMC has entered into cross-licenses with three large Fortune 100 companies: IBM, HP, and Hitachi. Speed Decl., Exs. BB, CC, & DD. Each agreement is a broad cross-license in which EMC received significant non-monetary benefits, in particular the freedom to practice across the massive patent portfolios of three of the largest technology companies in the world.

Speed Decl., Exs. BB at EMC_189568, CC at EMC_189510, & DD at EMC_189555. Zerto does not have an extensive patent portfolio like any of IBM, HP and Hitachi, but even if it did, EMC is not receiving a license to Zerto's patents. Those cross-license agreements do not remotely demonstrate that money damages are adequate compensation to EMC for Zerto's infringement. *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, No. 07-cv-00331, 2013 WL 3043668, *6 (D. Nev. June 17, 2013) (granting injunction and noting that previous licenses "contain additional non-monetary terms … which, in the absence of an injunction, Pulse would not have to agree to even if ordered to pay a reasonable royalty fee").

Moreover, although IBM, HP and Hitachi each compete with EMC in the data protection market, none is a direct competitor in the hypervisor-based replication market, and each cross-license was executed years before that market was even created. The cross-licenses do not suggest that money damages would adequately compensate EMC for Zerto's continued use of the four infringed patents. *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (identifying "the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer" as factors that affect whether a prior license indicates that money damages are adequate to compensate for infringement); *Finjan Software*, 2009 WL 2524495 at *10 (granting injunction despite evidence that patent owner was willing to license the patents-in-suit to competitors); *see also eBay v. MercExchange, LLC*, 547 U.S. 388, 393 (2006) (explaining that "plaintiff's willingness to license its patent" does not necessarily make an injunction improper).

EMC has also entered into two other licenses under unique circumstances.  In both cases, EMC acquired a company that had ongoing litigation in which the acquired company was asserting a patent.  The litigations did not align with EMC's business goals so EMC settled them post-acquisition, and the license agreements were part of the settlements.  The licenses are with NSI Software, Inc. and Columbia Data Products, Inc.  Speed Decl., Exs. EE, FF.  Neither agreement covers any of the four patents the jury found to be infringed.[7]  Accordingly, the licenses are not relevant to determining whether money damages would adequately compensate EMC for Zerto's use of the infringed patents.

The NSI and Columbia Data agreements also contain restrictions that distinguish each from the unfettered use of the infringed patents that Zerto would continue to enjoy absent an injunction. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ Zerto's use would be unlimited in the absence of an injunction.  *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, No. 07-cv-00331, 2013 WL 3043668, *6 (D. Nev. June 17, 2013) (granting injunction and noting that previous licenses "contain additional non-monetary terms … which, in the absence of an injunction, Pulse would not have to agree to even if ordered to pay a reasonable royalty fee").

---

[7]  Although the license involved the '222 patent, the jury found Zerto's customers did not infringe the '222 patent and EMC is not challenging that finding.  Therefore, the '222 patent is no longer at issue in this litigation.

Neither EMC's cross-licenses with Fortune 100 companies that look nothing like Zerto, nor its limited licenses arising from settlements of litigations that came with acquisitions and were not initiated by EMC, demonstrate that money damages are adequate compensation for an unrestricted compulsory license to Zerto, EMC's direct competitor.

## C. The Balance of Hardships Favors an Injunction

The substantial irreparable harm EMC will continue to suffer without injunctive relief far outbalances any potential harm to Zerto, which has violated EMC's patent rights for nearly four years and made no effort to stop even in the face of the jury's verdict.

To the extent that an injunction would harm Zerto's business, Zerto assumed the risk of such harm when it placed infringing goods into the market and continued its sales even after EMC filed suit and the jury found infringement. *Becton Dickinson*, 2008 WL 4745882 at *4 ("Tyco's business relationship may be harmed by an injunction, but that is the risk that Tyco took when it placed a potentially infringing product on the market and continued to make sales of that product."); *Fairchild Semiconductor*, 2008 WL 5210843 at *1 (explaining that defendant's conduct, not the enjoining of it, would cause harm to the defendant's industry reputation).

Based on the position Zerto presented to the jury, it should not be heard to now suggest it suffers substantial harm from an injunction on the three infringed patents (i.e., the '091, '395 and '867 patents) that relate to the VSS checkpoint function in ZVR. *See supra* Section IV.D.  In an effort minimize the patented inventions and limit damages for its infringement, Zerto (through its founder Oded Kedem) told the jury that only one percent of the virtual machines that ZVR protects use the VSS functionality.  T.T. at 914:4-16.  Zerto provided no document in support of Mr. Kedem's testimony.  Nevertheless, Zerto's damages expert Russell Parr relied on that testimony and told the jury that because only "one percent" of Zerto's VMs purportedly use the functionality, the feature (and the patents covering it) are "almost worthless."  T.T. at 1489:2-4.

Zerto cannot now credibly suggest that an injunction against infringing the Rokicki and '867 patents would cause it to suffer substantial harm.[8]  The purportedly low value of the infringing functionality confirms that the balance of hardships favors granting EMC its requested injunction.  *Douglas Dynamics*, 717 F.3d at 1345 ("If indeed Buyers had a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct.").

Finally, the fact that EMC is a large company with multiple product lines does not minimize the irreparable harm it has suffered and is suffering.  *See Robert Bosch LLC v. Pylon Manufacturing Corp.*, 659 F.3d 1142, 1152 (Fed. Cir. 2011) ("[T]he fact that an infringer's harm affects only a portion of a patentee business says nothing about whether that harm can be rectified."); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1330 (Fed. Cir. 2008) (Lourie, J., concurring) ("[A] patent provides a right to exclude infringing competitors, regardless of the proportion that the infringing goods bear to a patentee's total business.").  "A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." *Robert Bosch*, 659 F.3d at 1156.

In comparison to the irreparable harm EMC has suffered and is suffering due to Zerto's infringement, Zerto faces no hardships, especially when it can discontinue its use of infringing features.  The balance of hardships weighs decidedly in EMC's favor.

---

[8]  As discussed above in Section IV.D, Zerto can also re-design how it mirrors data from one storage system  to another in order to avoid infringing the '460 patent.  Zerto has not done so, however.  T.T. (Ziv Kedem) at 864:11-15.

**D.    EMC's Proposed Injunction Will Not Adversely Affect the Public Interest**

The public has an interest in promoting innovation and enforcing patent rights.  *See, e.g.*, *Becton Dickinson*, 2008 WL 4745882 at *4 ("[I]t is almost redundant to note the substantial interest in enforcing valid United States Patents…."); *Abbott Labs v. Sandoz, Inc.*, 544 F.3d 1341, 1363 (Fed. Cir. 2008) ("The patent laws promote … progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development.").  The strong public policy favoring enforcement of patent rights weighs in favor of granting EMC an injunction.

Zerto can identify no legitimate public interest that would justify a contrary result. EMC's patented technology does not relate to or impact any public health concerns, and the public interest's low-cost software does not outweigh its interest in recognizing valid patent rights.  The general policy favoring enforcement of patent rights should control.  *Fisher-Price, Inc. v. Safety 1st, Inc.*, 279 F. Supp. 2d 526, 528-29 (D. Del. 2003) (granting injunction and finding "no countervailing harm to the public in granting the requested injunctive relief" where the infringed products "are not medically necessary items"); *Research Found. of State Univ. of New York v. Mylan Pharm. Inc.*, 723 F. Supp. 2d 638, 663 (D. Del. 2010) (granting a preliminary injunction: "[T]he public interest in recognizing Plaintiffs' patent rights, and more generally promoting continued, large-scale investment in research and development of new pharmaceuticals, outweighs the public's interest in promoting generic, low-cost alternatives to branded pharmaceuticals.").

## VI.    CONCLUSION

The equities strongly favor entry of a permanent injunction to stop Zerto's four years of infringement.  EMC has suffered and continues to suffer irreparable harm due to Zerto's unlawful competition in a nascent, but growing market.  Accordingly, EMC requests that the Court enter an order permanently enjoining Zerto from making, using, selling, and/or offering to sell within the United States and/or importing into the United States versions 1.0, 2.0, 3.0, 3.1 and 3.5 of ZVR as well as any versions of the software not colorably different from the infringing versions, including the recently-released version 4.0.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

OF COUNSEL:

*Attorneys for Plaintiffs*

Michael N. Rader
Allen S. Rugg
Richard F. Giunta
Nathan R. Speed
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA  02210-2206
(617) 646-8000

Paul T. Dacier
Krishnendu Gupta
William R. Clark
EMC CORPORATION
176 South Street
Hopkinton, MA  01748

June 19, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 24, 2015, upon the following in the manner indicated:

| | |
|---|---|
| Adam W. Poff, Esquire<br>Monté T. Squire, Esquire<br>Gregory J. Brodzik, Esquire<br>YOUNG CONAWAY STARGATT & TAYLOR, LLP<br>1000 North King Street<br>Wilmington, DE  19801<br>*Attorneys for Zerto, Inc.* | *VIA ELECTRONIC MAIL* |
| Matthew B. Lowrie, Esquire<br>Aaron W. Moore, Esquire<br>Kevin M. Littman, Esquire<br>Lucas I. Silva, Esquire<br>FOLEY & LARDNER LLP<br>111 Huntington Avenue, Suite 2600<br>Boston, MA  02199-7610<br>*Attorneys for Zerto, Inc.* | *VIA ELECTRONIC MAIL* |
| Aaron J. Weinzierl, Esquire<br>FOLEY & LARDNER LLP<br>321 North Clark Street, Suite 2800<br>Chicago, IL  60654<br>*Attorneys for Zerto, Inc.* | *VIA ELECTRONIC MAIL* |

*/s/ Michael J. Flynn*

Michael J. Flynn (#5333)